1  **WO**

2

3

4

5

6                 **IN THE UNITED STATES DISTRICT COURT**

7                      **FOR THE DISTRICT OF ARIZONA**

8

9  United States of America,                    )   CR 09-1248 -PHX-DGC
                                                )
10            Plaintiff,                         )   **ORDER**
                                                )
11  vs.                                          )
                                                )
12  Hugo Alonso Guerrero-Heredia,                )
                                                )
13            Defendant.                         )
    ─────────────────────────────────           )

14

15         Defendant Hugo Alonso Guerrero-Heredia is charged with being a felon in possession

16  of a firearm and ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  He has

17  filed a motion to suppress statements made and firearms seized on the morning of August 12,

18  2009.  Dkt. #17.  The government has filed a response (Dkt. #22), and the Court held an

19  evidentiary hearing on February 18, 2010.  For reasons that follow, the Court will deny

20  Defendant's motion.

21  **I.     Factual Background.**

22         At the evidentiary hearing, the Court heard testimony from Yuma County Sheriff's

23  Deputy Bobby Garcia, Yuma County Sheriff's Deputy Doug Clabaugh, and Defendant

24  Guerrero-Heredia.  The Court also has listened to a 15-minute audio tape made by Deputy

25  Garcia during a portion of the stop of Defendant and his vehicle.[1]  The following facts are

26

27
   ─────────────────
28         [1] Defense counsel stipulated to the authenticity of the tape during the hearing on
    February 18, 2010, and stated no objection to the Court's review of the tape.

1  based on evidence presented during the hearing, including the Court's credibility
2  determinations, as well as the audio tape.

3       At approximately 12:00 a.m. on the morning of August 12, 2009, Deputies Garcia and
4  Clabaugh were responding to a noise complaint at a trailer park near Yuma, Arizona. While
5  at the trailer park, both deputies heard three to four gunshots coming from an agricultural
6  field to the south. When the deputies looked to the sound of the gunshots, they saw a vehicle
7  on a road approximately one-half mile to the south. They saw no other vehicles or
8  individuals in the vicinity. Immediately after the gunshots, the vehicle's lights came on and
9  the vehicle began driving away from the area at a high speed. Both deputies were certain the
10  gunshots had come from occupants of the vehicle.

11       The deputies immediately returned to their patrol vehicles and Deputy Garcia began
12  following the car that was leaving the agricultural field. Deputy Clabaugh drove to the
13  location of the shooting to determine whether any victims were involved. When he found
14  no victims, he began following Deputy Garcia by listening to Garcia's radio reports.

15       Deputy Garcia followed the vehicle for several miles, eventually seeing it turn left
16  onto 20th Street in a residential area. As Deputy Garcia turned onto 20th Street, he saw that
17  the vehicle had made a u-turn and was driving toward him. Deputy Garcia activated his
18  vehicle's overhead lights and pulled directly in front of the approaching vehicle. As Deputy
19  Garcia and the vehicle came to a stop facing each other, Deputy Clabaugh pulled his patrol
20  car, with lights flashing, to the right side of Deputy Garcia's vehicle. The deputies' patrol
21  cars blocked the road entirely, but Defendant could have backed up had he chosen to do so.

22       As all three vehicles came to a stop, the deputies saw two individuals in the front seat
23  of the vehicle they had been pursuing – Defendant, who was driving, and Tatiana Grier, who
24  was in the passenger's seat. The deputies exited their patrol cars, drew their guns, and
25  directed Defendant and Grier to place their hands on the steering wheel and dashboard.
26  Deputy Garcia then asked "where's the gun at?" Defendant responded: "In the back."
27  Deputy Garcia directed Defendant not to reach for the gun, at which point Defendant said the
28  gun was "in the trunk." Defendant then volunteered that he was "just trying it out." Deputy

Garcia directed Defendant to pull a lever to open the trunk, and Defendant complied. Lying in the trunk was a .45 caliber rifle loaded with a 30-round magazine. Deputy Garcia removed the magazine and noted that a round of ammunition was jammed in the gun's chamber. Deputy Garcia asked Defendant if the gun had jammed, and Defendant confirmed that it had. After some effort, Deputy Garcia rendered the gun safe by clearing the jammed round. He then placed the rifle on the hood of his patrol car.

While Deputy Garcia was securing the rifle, Defendant and Ms. Grier told Deputy Clabaugh that there was another weapon located under the passenger's side seat of the car. After the rifle was secured, Deputy Garcia directed Defendant to get out of the car and place his hands on his head. Deputy Garcia asked Defendant his name. Upon smelling an odor of marijuana, Deputy Garcia asked if Defendant had been smoking marijuana, to which he responded "no sir." Deputy Garcia asked if there were other weapons in the car, and Deputy Clabaugh responded that there was and he was retrieving it. Defendant told Garcia that he had volunteered the information about the other weapon. A Taurus handgun was found under the passenger's seat.

Deputies Garcia and Clabaugh holstered their weapons. Deputy Garcia handcuffed Defendant, but stated that he was not under arrest, just being detained. Deputy Garcia asked: "mind if we search the car?" Defendant responded "go ahead, sir, go ahead, go ahead." The deputies found two loaded magazines in the center console of the car.

When Deputy Garcia performed a pat-down of Defendant, he found an electronic scale in Defendant's pants pocket. Garcia placed Defendant in the back of Garcia's patrol car. Deputy Clabaugh placed Ms. Grier in his patrol car. Deputy Garcia again told Defendant he was being detained, but was not under arrest at that point.

The scale found in Defendant's pocket was covered with a white crystalline residue. Another deputy who had arrived at the scene field-tested the residue and found it to be methamphetamine. At this point, Deputy Garcia's pocket tape recorder, which began recording the events when the gunshots were first heard, was either turned off or ran out of recording capacity. Just over 15 minutes had elapsed on the tape.

At approximately 12:28 a.m., Deputy Garcia informed Defendant that he was under arrest for misconduct involving weapons. Deputy Garcia read *Miranda* warnings to Defendant while he was seated in the back of Garcia's patrol car. Defendant confirmed that he understood the *Miranda* warnings. He then proceeded to tell Deputy Garcia how he came into possession of the two firearms and the electronic scale. He admitted firing both guns, stating that he had fired the handgun in the field south of the trailer park. Defendant also admitted that he had smoked marijuana earlier in the evening and that he had two felony convictions.

Ms. Grier was not arrested. Defendant's car was impounded and towed. Prior to being towed, an inventory search was conducted of the vehicle.

## II.     Defendant's Arguments.

In his motion and at the hearing on February 18, 2010, Defendant made several arguments. He contends that the officers did not have reasonable suspicion to stop his vehicle on the morning of August 12, 2009. He also claims that he was in custody when the officers stopped him and pulled their weapons, and that any questions asked of him in this custodial setting, including questions concerning the location of guns, violated his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). Defendant further contends that he was arrested without probable cause when the deputies stopped him and pointed their guns at him, and that his consent to a search of the vehicle was the product of coercion and thus invalid. Defendant asks the Court to suppress all statements made to the officers, including those made after the *Miranda* warning as fruit of the poisonous tree, as well as the weapons and ammunition found in his vehicle.

### A.     The Deputies Conducted a Valid *Terry* Stop.

In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court held that officers may conduct an investigatory stop in situations where they lack probable cause for an arrest. *Id*. at 24. Such a stop does not violate the Fourth Amendment "if the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quotations and citations omitted). The Court must look at the

totality of the circumstances to determine whether the officer has a particularized and objective basis for suspecting wrongdoing. *Id.* "Although an officer's reliance on a mere 'hunch' is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Id.* at 274 (quotations and citations omitted).

In this case, Deputies Garcia and Clabaugh heard three to four gunshots at approximately midnight. When they looked in the direction of the shots, they saw the lights of a vehicle come on and the vehicle leave the field at a high rate of speed. Deputy Garcia followed the vehicle until he stopped it in a residential area. At this point, Deputy Garcia (and Deputy Clabaugh, who arrived only seconds later) clearly had reasonable cause to suspect that criminal activity may be afoot. Their reasonable suspicion arose not only from the late-night gunshots, but also from Defendant's rapid departure from the location of the gunshots. The Court accordingly finds that Deputies Garcia and Clabaugh did not violate Defendant's Fourth Amendment rights when they initiated an investigatory stop of his vehicle.

## B. Defendant Was Not Immediately Placed Under Arrest.

The fact that a defendant is temporarily seized as part of a *Terry* stop does not mean that he is placed under arrest. *Haynie v. County of Los Angeles*, 339 F.3d 1071, 1077 (9th Cir. 2003). "The purpose of a *Terry* stop is to allow the officer to pursue his investigation without fear of violence" and, as a result, "we allow intrusive and aggressive police conduct without deeming it an arrest . . . when it is a reasonable response to legitimate safety concerns on the part of the investigating officers." *United States v. Guzman-Padilla*, 573 F.3d 865, 884 (9th Cir. 2009) (internal quotations and citations omitted) (ellipsis in original). The Supreme Court has observed that officers conducting a *Terry* stop may "exercise unquestioned command of the situation," may order the driver to get out of the vehicle, and may order passengers out of the vehicle. *Arizona v. Johnson*, — U.S. —, 129 S.Ct. 781, 786 (2009) (citations omitted). The Ninth Circuit has held that officers may handcuff suspects during a *Terry* stop based on concerns for the officers' safety, *see United States v. Cervantes-*

*Flores*, 421 F.3d 825, 830 (9th Cir. 2005), and also may draw their weapons, order the suspect out of a car, and handcuff the suspect while a weapon is located, s*ee Guzman-Padilla*, 573 F.3d at 884 ("[O]fficers with a particularized basis to believe that a situation may pose safety risks may handcuff or point a gun at an individual without converting an investigative detention into an arrest"); *Alexander v. County of Los Angeles*, 64 F.3d 1315, 1320 (9th Cir. 1995) ("It is well settled that when an officer reasonably believes force is necessary to protect his own safety . . . measures used to restrain individuals, such as stopping them at gunpoint and handcuffing them, are reasonable"); *see also United States v. Elston*, 479 F.3d 314, 319 (4th Cir. 2007) (finding that officers did not exceed the boundaries of a *Terry* stop by drawing their weapons and placing the suspect in handcuffs); *United States v. Sholas*, 478 F.3d 850, 853 (7th Cir. 2007) (finding it reasonable for officers to order suspect out of house and handcuff him, with drawn weapons, because of inherent danger of situation involving late-night phone call reporting gun fire); *United States v. Marxen*, 410 F.3d 326, 332 (6th Cir. 2005) (finding it reasonable for officers to stop vehicle matching description of car used in bank robbery, remove and handcuff occupants, with guns drawn).

In this case, Deputies Garcia and Clabaugh used the force reasonably necessary to effect a safe investigatory stop. The deputies knew that gunshots had been fired from the vicinity of the vehicle and had seen the vehicle immediately leave the area at a high rate of speed. The deputies thus had good reason to believe that the occupants of the vehicle were armed and potentially dangerous. Commanding Defendant and Ms. Grier to place their hands on the steering wheel and dashboard, drawing guns, asking about the location of the gun, removing Defendant and Ms. Grier from the car, handcuffing them, and placing them in the back of the patrol vehicles were all reasonable steps to protect officer safety. Moreover, the stop occurred on a residential street. Carefully controlling the movements of the vehicle's occupants while weapons were located and rendered safe was clearly consistent with public safety.

During the evidentiary hearing, the parties provided conflicting testimony on whether the officers' weapons were pointed at Defendant. Both deputies testified that they held their

guns in the "ready position," pointed at the ground. Defendant testified that the deputies pointed their guns at him. The Court does not find this to be a dispositive issue. Whether pointed at the ground or at Defendant, the Court finds that the deputies' use of their weapons was reasonable given the dangerousness of this early-morning stop in a residential neighborhood immediately after shots had been fired and Defendant had left the scene of the shooting in apparent haste.

Finally, the Court notes that the stop lasted no longer than was reasonably necessary. The vehicle was stopped, the suspects removed, the weapons found and secured, and the suspects placed in patrol vehicles all in approximately 15 minutes. Defendant was placed under arrest 28 minutes after the gunshots were fired. "A brief, although complete, restriction of liberty, such as handcuffing, during a *Terry* stop is not a de facto arrest, if not excessive under the circumstances." *Haynie*, 339 F.3d at 1077. The amount of force used and the length of the stop did not transform the stop into an arrest.

Once the weapons had been located and Defendant had admitted firing them in the field, and once the Defendant was found in possession of an electronic scale containing methamphetamine residue, the officers clearly had probable cause for an arrest. Defendant was then lawfully placed under arrest.

## C.    Defendant's *Miranda* Rights Were Not Violated.

*Miranda* requires that warnings be given only for custodial interrogations. *Miranda*, 384 U.S. at 444. To determine whether a suspect is in custody for purposes of *Miranda*, courts examine the totality of the circumstances surrounding the interrogation and ask whether a reasonable person would have felt that he or she was at liberty to terminate the interrogation and leave. *See United States v. Craighead*, 539 F.3d 1079, 1082 (9th Cir. 2008).

The Court concludes that Defendant, although not arrested, was in custody for purposes of *Miranda* from the beginning of the investigative stop. He was confronted by two patrol vehicles with lights flashing, two deputies with guns drawn, and was given firm commands to place his hands on the steering wheel and not move them. A person in this

situation would not have felt free to terminate the encounter and leave.

The Court concludes, nonetheless, that *Miranda* warnings were not required at this stage of the encounter. The Supreme Court has recognized a "public safety" exception to the *Miranda* rule. *See New York v. Quarles*, 467 U.S. 649, 655 (1984). The exception applies when officers, in the act of stopping a suspect, are confronted with an immediate need to locate a gun. *Id.* at 657. So long as the gun remains concealed, it poses a danger both to the officers and the public. As the Ninth Circuit has explained, "[i]n order for the public safety exception to apply, there must have been 'an objectively reasonable need to protect the police or the public from immediate danger.'" *Allen v. Roe*, 305 F.3d 1046, 1050 (9th Cir. 2002) (quoting *United States. Carrillo*, 16 F.3d 1046, 1049 (9th Cir. 1994)).

When Deputies Garcia and Clabaugh stopped Defendant's vehicle, there was a clear and reasonable need to protect the police and public from immediate danger. The deputies had strong reason to believe that Defendant or his passenger had recently fired a weapon, in the early morning hours, and then had fled rapidly from the location of the shooting. They had objectively reasonable grounds to believe there was a weapon in Defendant's vehicle. They were in a residential area. Clearly, the public safety exception allowed the officers to ask Defendant where the weapons were located. Such a question did not violate Defendant's rights under *Miranda*.

Nor does the Court conclude that Defendant's other statements violated *Miranda*. When Deputy Garcia had difficulty clearing the rifle found in the trunk and asked Defendant if it had jammed, Defendant's response was given as part of Deputy Garcia's efforts to secure public safety by clearing the weapon. And when Defendant volunteered that he was "just trying out" the gun, his statement was spontaneous and voluntary and not made in response to a question. *Miranda*, 384 U.S. at 478 (volunteered statements do not violate the Fifth Amendment and are not subject to *Miranda*).

Finally, statements made by Defendant after he was given a *Miranda* warning were fully informed and voluntary. Defendant confirmed to Deputy Garcia that he understood the warning. Defendant testified during the evidentiary hearing that he had been arrested before

- 8 -

and understood the meaning of *Miranda* warnings.  The audio tape makes clear that the deputies conducted the investigatory stop with a reasonable and courteous tone.  Their weapons were holstered before Defendant was arrested and given the *Miranda* warning.  The Court finds no basis to conclude that the warning was invalid or Defendant's statements after the warning were involuntary or coerced in any way.

**D.    The Search of the Vehicle Was Lawful.**

**1.    Search of the Trunk and Passenger Compartment.**

For several reasons, the Court concludes that the deputies' search of Defendant's trunk and vehicle were not unlawful.  In *Brady*, the suspect told the investigating officer that there was a weapon in the trunk of his car.  The Ninth Circuit held that the officer's subsequent search of the trunk was justified by probable cause because California law made it unlawful to conceal a firearm in a vehicle without a permit.  819 F.2d at 889.  Probable cause was further provided by California law that prohibited carrying a loaded firearm in a vehicle in a public place.  *Id*.

In this case, Deputy Garcia had probable cause to believe that Defendant had violated Arizona law when he discharged a gun near a residential neighborhood.  *See* A.R.S. § 13-2904(A)(6) (person commits disorderly conduct by recklessly discharging a deadly weapon in the area of a neighborhood).  Once Defendant admitted that there was a gun in the trunk, Deputy Garcia was justified in conducting a limited search of the trunk for the same reason as the officer in *Brady* was justified in searching the trunk.  819 F.2d at 889.

The deputies were also justified in searching the passenger compartment of Defendant's vehicle.  In *Michigan v. Long*, 463 U.S. 1032 (1983), the Supreme Court held that a police officer may search an automobile passenger compartment for weapons if he has reason to believe that the person is dangerous or the car contains weapons.  *Id*. at 1048-49.  This conclusion is bolstered by the fact that Defendant and Ms. Grier told Deputy Clabaugh there was a weapon concealed beneath the passenger's seat.

Moreover, "[o]fficers may search an automobile so long as they have probable cause." *United States v. Ybarra*, 345 F.3d 711, 715 (9th Cir. 2003).  "Probable cause to search exists

when the known facts and circumstances are sufficient to warrant a reasonable person to conclude that contraband or evidence of a crime will be found." *Id.* at 716. In this case, once Defendant acknowledged that there was a gun in the vehicle, and once he had spontaneously volunteered that he was "just trying it out," the deputies had probable cause to believe that Defendant had fired the weapon at midnight near a residential area in violation of Arizona law. *See* A.R.S. § 13-2904(A)(6). By his own admission, evidence of the crime – a gun – was located in the trunk. The deputies thus had probable cause to search the trunk, and later the passenger compartment, for guns.

Although the parties did not discuss it in their memoranda, the Court also has considered the Supreme Court's recent decision in *Arizona v. Gant*, — U.S. —, 129 S.Ct. 1710 (2009). *Gant* held that officers may conduct a warrantless search of a vehicle's passenger compartment, incident to an arrest, only in two circumstances. First, they may search the vehicle "when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search." *Id*. at 1719. Second, they may search when it is "reasonable to believe the vehicle contains evidence of the offense of arrest." *Id*. at 1721; *see also United States v. Ruckes*, 586 F.3d 713, 715 (9th Cir. 2009). Both circumstances existed in this case.

As reflected in the audio tape, Defendant was not arrested or restrained when the rifle was retrieved from the trunk or the taurus handgun from beneath the passenger seat. After securing the rifle from the trunk, Deputy Garcia asked Defendant to step out of the car and place his hands on his head. Garcia then asked whether there were any other weapons in the vehicle. Deputy Clabaugh can be heard on the tape saying "yeah, I'm going to pull it out right now." Defendant then said to Deputy Garcia: "I volunteered that – the, the weapon." Garcia said "you volunteered it?" Defendant replied "well, you know, he asked me." Deputy Garcia then asked Defendant to put his hands down and the sound of him being handcuffed can be heard. *See* Audio Tape at 9:58-10:28. Thus, the taurus handgun was retrieved from the vehicle before Defendant had been handcuffed and when he was within reaching distance of the passenger compartment.

Moreover, the offense for which Defendant had been stopped and ultimately would be arrested was misconduct involving weapons. The officers had heard gun shots coming from Defendant's vehicle; when first stopped, Defendant volunteered that he had fired a gun (he was "just trying it out"); and Defendant and Ms. Grier told the deputies that guns were in the trunk and under the passenger seat. Clearly, the deputies had good reason to believe that the vehicle contained evidence of the offense for which Defendant was stopped and ultimately would be arrested.

## 2. Consent.

The Court also concludes that Defendant voluntarily consented to the search of the vehicle. When Deputy Garcia asked if they could search the vehicle, Defendant responded "go ahead, sir, go ahead, go ahead." At this point the deputies had holstered their weapons. The audio tape makes clear that the question (along with all of the other statements and questions of the deputies that evening) was asked in a reasonable and courteous tone, and that Defendant's response was immediate, cooperative, and voluntary. Defendant's consent to the search rendered it lawful. *See, e.g., United States v. Vongxay*, — F.3d —, 2010 WL 431768, *7 (9th Cir. 2010) (finding valid consent to a search, even though Defendant was not told that he could decline consent); *United States v. Crapser*, 472 F.3d 1141, 1149 (9th Cir. 2007) (finding valid consent to a search, even though the Defendant was in custody).

## 3. Inevitable Discovery.

Finally, even if the deputies somehow erred in searching for weapons in the trunk and passenger compartment, the Court concludes that the guns would still be admissible under the inevitable discovery exception to the exclusionary rule. Under this exception, evidence obtained in violation of the Fourth Amendment is admissible "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444 (1984). Such lawful means include routine police procedures such as inventory searches of items seized during an arrest. *Ruckes,* 586 F.3d at 718-19; *United States v. Ankeny*, 502 F.3d 829, 835 n.2 (9th Cir. 2007); *United States v. Mancera-Londono*, 912 F.2d 373 (9th Cir. 1990);

*United States v. Andrade*, 784 F.2d 1431, 1433 (9th Cir. 1986).

In this case, Defendant's acknowledgment that he had a gun in the vehicle as well as his spontaneous statement that he was "just trying it out" provided probable cause for the deputies to arrest Defendant for misconduct involving weapons and for violation of A.R.S. § 13-2904(A)(6). Defendant's vehicle was towed to a law enforcement facility as a result of his arrest. Deputy Clabaugh testified that his department's standard operating procedure required that the vehicle be towed and that the contents be inventoried to identify all items of value. Because the weapons would have been found during the routine inventory search, the Court concludes that they would inevitably have been discovered and are therefore admissible even if the initial searches of the trunk and passenger compartment were improper. *Ruckes*, 586 F.3d at 718-19.

**III.  Conclusion.**

Deputies Garcia and Clabaugh conducted a valid *Terry* stop of Defendant and his vehicle, the level of force and length of the stop were reasonable given the dangerousness of the situation, the deputies' initial questions of Defendant were justified by the public safety exception to the *Miranda* rule, their post-*Miranda* questions were proper, and their search of the vehicle did not violate the Fourth Amendment.

**IT IS ORDERED** that Defendant's Motion to Suppress Evidence and Statements (Dkt. #17) is **denied**.

Excludable delay pursuant to U.S.C. § 18:3161(h)(1)(D) is found to commence on January 19, 2010 or a total of 37 days.

DATED this 24th day of February, 2010.

*David G. Campbell*
_____
David G. Campbell
United States District Judge

- 12 -